**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **JUSTIN L. HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 11-CV-567-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Justin L. Harris ("Harris"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Harris appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Harris was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Harris testified at two hearings before the ALJ on June 25, 2009 and May 20, 2010.  (R. 31-100).  Harris said that he had not worked since February 1, 2008.  (R. 40).  At the time of the 2009 hearing, Harris was 46 years old.  (R. 63).  He had graduated from high school and had taken six to eight hours of college classes.  (R. 64).  Harris testified that he had learning disabilities in school, and he had to be careful not to transpose numerals.  *Id.*  He had last worked as a senior plastic technician for a petrochemical company.  (R. 65).

He left work after February 1, 2008 due to a back injury.  (R. 67).  He did not think he could work due to his back injury, and he also experienced depression and anxiety.  (R. 68).  He had two colon surgeries for the removal of a significant portion of his colon, and he needed to use the bathroom frequently as a result.  (R. 68-69).

Harris testified that the primary problem with his back was pain in the lower back, and he had fusion surgery at the L5/S1 level.  (R. 71).  He had problems with flexibility, stiffness, aching, and pain in his legs.  *Id.*  He had difficulty getting out of bed, and he sometimes had help from his wife.  *Id.*  Because of his limited ability to reach, he had difficulty with personal hygiene such as cleaning after using the toilet.  (R. 72).

From a standing position, Harris could reach over to touch his knees, but not his toes.  (R. 73).  He could squat and get back up, but he would have difficulty due to pain in his legs and lower back.  *Id.*  He could walk up and down a flight of stairs, but he would be fatigued, and he would need to watch carefully the placement of his feet so that he would not trip and stumble.  *Id.*  At times his feet were numb.  *Id.*  He testified that during physical examinations his physicians would test reflexes in his left leg, and there would be no response to the test.  (R. 74).  His symptoms were exacerbated by extreme cold fronts.  *Id.*

2

Harris had a driver's license, and he estimated that he drove 30 or 40 miles on average per week.  (R. 75).  He testified that he had no problems using the gear shift, accelerator, brake, or clutch.  (R. 76).  He avoided reaching over his head, and he had difficulty with that and with reaching behind him due to his back issues.  *Id.*

Harris testified that medication helped his depression somewhat, as did counseling.  (R. 77).  Two years earlier, he had spent a week at a psychiatric hospital due to depression and anxiety.  *Id.*  He said that he had days when he did not want to get out of bed.  *Id.*  At times, he had difficulty with concentration and forgetfulness.  (R. 78).  He could watch an hour of television without attention problems.  *Id.*  He testified that he had problems getting along with people due to anger management issues.  *Id.*

In addition to medication for his depression, Harris testified that he tried to keep busy, to take walks, to do light housework and yard work, and to avoid sitting and dwelling on things. (R. 80).  He used a riding mower, and used a weed eater on a very limited basis.  (R. 83).  He used a push mower in locations where the riding mower wouldn't go.  (R. 84).  He helped with the dishes, dusting, vacuuming, making the bed, doing laundry, cooking, and shopping, but he did not mop.  (R. 80-81).  When he did these chores, he did them for short periods of time, and he sat and rested at intervals.  (R. 87).  He had young grandchildren, but he rarely was the only adult taking care of them.  (R. 81).  He watched television occasionally, and he read magazines. *Id.*  He belonged to a sportsman's club, and he fished from the lake bank.  (R. 82).  He played guitar "once in a while."  *Id.*  He used to coon hunt several nights a week, and he now hunted about once every two weeks.  (R. 82-83).  He had gotten rid of all of his competition hounds, and he only had two dogs.  (R. 83).  He used a cattle prod to walk, and if the dogs went a long way, he and his hunting companions would use a vehicle to drive closer.  *Id.*  If he was unable to walk,

or if his back gave out, his hunting friends would get the dogs.  *Id.*

Harris said that he had trouble getting to sleep because his mind would not shut down, and because of back pain.  (R. 84).  He also would wake up in pain during some nights.  *Id.*  On a better than average night, he would get about six to seven hours of sleep.  *Id.*  He napped about an hour to an hour-and-a-half during the day.  (R. 84-85).

At the hearing in June 2009, Harris testified that he could sit for about 30 minutes to an hour before needing to stand up.  (R. 85).  At the May 2010 hearing, Harris said that his back had gotten worse, and he experienced more back and leg pain.  (R. 41-42).  He said that he started having leg pain and foot numbness after sitting for 15 or more minutes.  (R. 42).  He testified that he had been to a two-hour sporting event sitting in the stands, and the pain was intolerable sitting, so he got up three or four times.  *Id.*  The next day, he was in bed and could not get around.  *Id.*  He could stand for about ten minutes.  *Id.*  He could walk about a quarter or half mile.  *Id.*  His doctors had given him a 10-pound lifting restriction.  (R. 85-86).  His most comfortable position was lying down on his side with pillows behind his knees, and lying on his back with pillows under his knees was his second best position.  (R. 88).  He spent about an hour-and-a-half in these positions during the day.  *Id.*

At the May 2010 hearing, Harris testified that he had experienced a recent episode where his back "gave out," and the pain medication did not help.  (R. 42-43).  Staying in bed for several days did not help.  (R. 43).  He had seen his physician the day before the hearing, and the examination of the physician's assistant showed that he had reduced sensation in his feet.  (R. 44).  The physician told him that they were going to schedule another myelogram.  (R. 44-45).  Harris said that in the period between the two hearings he had about four or five episodes of his back "going out."  (R. 48).

There were about three or four days a month that he could not leave the house due to his physical or psychological problems.  (R. 88).

After the first hearing, Harris experienced episodes of high blood pressure and heart rates. (R. 49-50).  He also had pneumonia, and a new primary care physician recommended surgery, which Harris had, to correct a deviated septum and sinus issues.  (R. 50).

Medical records from 2007 reflect that Harris had earlier undergone anterior resection for diverticulitis and right colectomy for lower gastrointestinal bleeding.  (R. 304-12, 484-65).

Medical records show that Harris began seeing Kyle Stewart, M.D. for psychiatric treatment on June 14, 2006 on referral from Tony A. Little, D.O. and he saw him regularly through October 2009.  (R. 361-64, 403-11, 431-33, 646-48, 743-44).  Dr. Stewart's hand-written notes generally reflect diagnoses of depression and generalized anxiety disorder, with prescriptions of Cymbalta, Clonazepam, and Effexor.  *Id.*

On December 12, 2006, Harris saw Dr. Little because his back "went out" the day before. (R. 348-49).  Dr. Little prescribed a steroid, Lortab, and Flexeril.  (R. 348).  For Harris' depression and anxiety, he discontinued Cymbalta, but continued Clonazepam and Effexor XR. *Id.*

On January 22, 2007, Harris was seen for a consultation with  Frank Tomecek, M.D. with the Oklahoma Spine and Brain Institute.  (R. 320, 322-26).  Harris told Dr. Tomecek that he had a sudden onset of low back pain on December 15, 2006 at work.  (R. 320).  He received relief from Lortab and Flexeril.  *Id.*  He said that he experienced numbness and tingling in his feet, with his left side worse than right, and leg weakness.  *Id.*  He said that he had been stumbling and tripping.  *Id.*  On physical examination, Harris was able to rise from a chair and climb onto the examination table without assistance.  (R. 323).  He had limited range of motion, and all attempts

elicited pain.  *Id.*  His deep tendon reflexes were 0 in the left patellar tendon, 1 in the right, and 1 in the Achilles tendons bilaterally.  *Id.*  Portions of his left foot had reduced sensation to pinprick. *Id.*  Dr. Tomecek confirmed that Harris had fusion from L3 to the sacrum 13 years earlier.  *Id.*

A myelogram performed on February 8, 2007, showed no problems with the previous fusion.  (R. 325-26).  The L2/L3 level showed mild degenerative disk disease with a central disk protrusion minimally indenting the anterior theca.  (R. 326).  On February 19, 2007, Dr. Tomecek reviewed the myelogram with Harris, and he noted that Harris had improved and had returned to lifting 80-pound bags of feed.  (R. 319).  Dr. Tomecek released Harris to work with a 25-pound lifting restriction and prescribed physical therapy.  *Id.*  At a follow-up appointment on April 6, 2007, Harris was experiencing leg pain and described himself as "very achy."  (R. 318). Dr. Tomecek continued Harris on a 25-pound lifting restriction.  *Id.*

At an appointment on May 9, 2007, Dr. Little said that Harris' anxiety and depression were stable, and he encouraged Harris to exercise to complement his medications.  (R. 337-38).

At a follow-up appointment with Dr. Tomecek on May 21, 2007, while Harris continued to have some discomfort, he had returned to all of his previous activities, including heavy labor. (R. 317).  On August 20, 2007, Harris reported that he had an episode at work when he lifted an 8-pound bottle and twisted, resulting in significant pain and inability to move.  (R. 315-16).  The pain had been improving since then, and Harris had been working normal hours and duties.  (R. 315).  Dr. Tomecek prescribed an epidural steroid injection and selective nerve block at the L3 level.  *Id.*  Harris had the steroid injections.  (R. 442-52).  On October 15, 2007, Dr. Tomecek thought that Harris was doing too well to justify surgical intervention.  (R. 313-14).

On December 27, 2007, Dr. Little assessed Harris with back pain with narcotic dependence, and he gave him a plan to taper off Lortab.  (R. 333-34).  On January 3, 2008, Harris

asked for a referral to pain management, and Dr. Little made that referral.  (R. 331-32).

On January 7, 2008, Harris saw Kalvin L. White, D.O. for a pain management evaluation. (R. 352-54).  Harris said that he continued to experienced significant pain from the December 2006 incident, and he took 2 to 4 Lortab a day to control that pain.  (R. 352).  He had chronic tingling in his legs, and his pain increased with bending and prolonged sitting or standing.  *Id.* Dr. White considered that Harris was using opioids appropriately and that Harris would continue to use them despite the risk of dependence.  (R. 354).  Dr. White asked Harris to continue walking and stretching, and he wanted to obtain Harris' treatment records.  *Id.*

Dr. Tomecek saw Harris on February 18, 2008, and he described Harris' pain as not increasing, and his decreased range of motion as mild.  (R. 368-69).  Dr. Tomecek also believed that Harris' pain was not coming from the L2/L3 level, and he said that Harris functioned well with two or more Lortab a day.  (R. 368).  He described Harris as very active, and he said his examination was "neurologically normal."  *Id.*  Dr. Tomecek believed that Harris could work full time with a 25-pound lifting restriction.  (R. 369).

At an appointment on April 3, 2008, Dr. White said that Harris continued to have some pain, and was taking two to four Lortab, but was doing "quite well."  (R. 375).  On July 24, 2008, Harris reported an increase in pain to Dr. White.  (R. 582).  Dr. White encouraged Harris to limit his use of Lortab, and he prescribed Baclofen to help with muscle spasms.  *Id.*  He also encouraged Harris to exercise more and to watch his weight.  *Id.*  Dr. White continued his medications at a follow-up appointment in November 2008.  (R. 580).

Harris saw Dr. Little on January 30, 2009 and said that he had fallen.  (R. 589-90).  Dr. Little felt that Harris had strained his right hip in his fall.  (R. 589).

At a March 19, 2009 appointment with Dr. White, Harris reported that he had fallen in January, and he had been experiencing increasing back and leg pain since that time. (R. 577). Dr. White increased the dosage of Harris' Lortab and Baclofen. *Id.* X-rays ordered by Dr. White appear to have reflected no acute findings. (R. 579). Harris attended physical therapy in March and April 2009. (R. 567-70).

Harris presented to the emergency room in Bartlesville with complaints of weakness or fatigue and was released after he felt better. (R. 719-24).

At a follow-up appointment on July 24, 2009, Dr. White continued Harris' Lortab and Baclofen, and he added Doxepin to help with sleep. (R. 635).

Harris was seen by Mark A. Robertson, M.D., an ear, nose, and throat specialist, for consultation on September 21, 2009 due to a foul odor in his nose. (R. 736). At a follow-up appointment on September 30, 2009, Harris was recovering from an episode of pneumonia. (R. 734). Dr. Robertson tentatively scheduled Harris for surgery to correct a deviated septum on October 30, 2009, and Harris had the surgery and had a good recovery. (R. 726-34).

On May 19, 2010, Harris returned to Dr. Tomecek and reported that his pain had gotten progressively worse for two years. (R. 740-42). He reported having fallen three or four times in the previous year. (R. 740). On examination, Dr. Tomecek found Harris' gait to be "ataxic and antalgic and slow and shuffling." (R. 741). Harris had decreased range of motion accompanied by pain, straight leg raising was positive, his reflex in his left patella was absent, and he had decreased sensation in the dorsum of the foot bilaterally. *Id.* Harris underwent a lumbar myelogram and CT scan of his lumbar spine on June 16, 2010. (R. 745-47). At the L2/L3 level, the reviewing physician noted several abnormalities that suggested a mild central stenosis, and he noted broad based disc bulging. (R. 746-47). He also found nerve root conditions suggesting

8

"some mild underlying arachnoiditis."  (R. 746).

Dr. Tomecek reviewed the imaging studies with Harris on June 17, 2010, and said that he did not see any "severe pathology" at the L2/L3 level and did not recommend surgery.  (R. 749-50).  He did, however, recommend hardware removal from L3 to the sacrum and possible revision at the L3/L4 level.  (R. 749).  Apparently the hardware was removed August 3, 2010.  (R. 760, 768).

Harris presented to the emergency room in Bartlesville with an ankle sprain on August 11, 2010.  (R. 771-82).

Dr. Tomecek saw Harris for follow-up on September 3, 2010, one month after removal of the hardware from his previous fusion.  (R. 758).  Dr. Tomecek said that Harris was having very little back pain and was walking up to six miles a day.  (R. 758).  He said that he thought returning to work was a realistic goal, and he increased Harris' lifting limitation to 20 pounds.  *Id.*  On September 15, 2010, Dr. Tomecek said that Harris had been doing well until a fall and then reported dramatically increased back pain.  (R. 755-56).  Dr. Tomecek said that an MRI showed no clear cause for Harris' pain.  (R. 755).  He prescribed Valium and aquatic physical therapy in an attempt to loosen Harris' back muscles.  (R. 756).  On October 18, 2010, Harris reported that he was improving on physical therapy.  (R. 753).  On December 3, 2010, Harris was walking 3 miles a day, doing exercises, and tapering his use of Lortab.  (R. 752).  Dr. Tomecek felt that Harris was at maximum medical improvement.  *Id.*

Agency nonexamining consultant Phillip Massad, Ph.D. completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on May 1, 2008.  (R. 377-94).  For Listing 12.04, Dr. Massad noted Harris' chronic depression, not otherwise specified, and dysthymia.  (R. 380).  For Listing 12.06, Dr. Massad noted Harris' generalized

anxiety disorder with occasional panic attack.  (R. 382).  For the "Paragraph B Criteria,"[1] Dr.

Massad found that Harris had mild restriction of activities of daily living, mild difficulties in

maintaining social functioning, and moderate difficulties in maintaining concentration,

persistence, or pace, with no episodes of decompensation.  (R. 387).  In the "Consultant's Notes"

portion of the form, Dr. Massad summarized Harris' claims as reflected in Social Security

Administration forms, and he concluded that Harris emphasized the limiting effect of his back

problems.  (R. 389).  He noted Dr. Stewart's discussion of depression, anxiety, and occasional

panic attacks, but he also noted that Harris' "[o]rientation, ability to think, reason, and respond"

were normal.  *Id.*  Dr. Massad summarized Harris' activities of daily living.  *Id.*

In his Mental Residual Functional Capacity Assessment, Dr. Massad found that Harris

was moderately limited in his ability to understand, remember, and carry out detailed

instructions.  (R. 391).  Dr. Massad also found Harris to be moderately limited in his ability to

interact appropriately with the general public.  (R. 392).  He found no other significant

limitations.  (R. 391-92).  Dr. Massad said that Harris had sufficient concentration and memory

to do simple, repetitive and some complex and detailed tasks.  (R. 393).  He found that Harris

would be able to work with the general public and integrate adequately with coworkers with

slight limitations.  *Id.*  He said that Harris could adapt to changes in a familiar environment.  *Id.*

---

[1]There are broad categories known as  the "Paragraph B Criteria" of the Listing of
Impairments used to assess the severity of a mental impairment.  The four categories are (1)
restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3)
difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of
decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R.
Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264,
1268-69 (10th Cir. 2008).

Nonexamining agency consultant Kenneth Wainner, M.D. completed a Physical Residual Functional Capacity Assessment dated May 1, 2008. (R. 395-402). Dr. Wainner found that Harris had the exertional capacity to perform light work. (R. 396). In the section for narrative comments, Dr. Wainner noted Harris' status post multilevel back fusion in 1987 and his chronic back pain and diffuse tenderness. *Id.* He noted that current examinations showed good strength and normal gait. *Id.* For postural limitations, Dr. Wainner found that Harris could frequently climb, balance, kneel, crouch, and crawl, but could only occasionally stoop. (R. 397). He found that no other limitations were established. (R. 398-402).

Agency examining consultant John W. Hickman, Ph.D., completed a disability evaluation report on August 29, 2009. (R. 597-606). On examination, Dr. Hickman noted that Harris' affect was blunted and constricted, and his mood was depressed and anxious. (R. 599). He often gave impulsive answers that he later corrected, and he often required instructions to be repeated. (R. 600). His working memory score was borderline, and his general memory score was average. *Id.* Testing scores indicated mild anxiety and moderate depression. (R. 601). His personality profile on the MMPI test was one that is "thought to be ineffectively trying to ward off anxiety by focusing on somatic concerns." *Id.* Harris was functioning in the low average range of mental ability. (R. 602). On Axis I[2] Dr. Hickman assessed major depressive disorder, "severe by history," general anxiety disorder by history, pain disorder associated with both psychological factors and a general medical condition, and nicotine dependence. *Id.* On Axis II, Dr. Hickman noted features of a histrionic personality disorder. *Id.* Dr. Hickman scored Harris' Global

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

Assessment of Functioning ("GAF") as 55,[3] reflecting "marked emotional difficulties."  *Id.*

Dr. Hickman concluded that Harris did not meet or equal any disability criteria.  *Id.*  Dr. Hickman also completed a Medical Source Statement, and he found that Harris had a moderate limitation of his ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 603-05).  He found no other significant limitations.  *Id.*

Agency examining consultant Beau C. Jennings, D.O. completed an examination and report dated September 18, 2009.  (R. 609-33).  On examination, Dr. Jennings found no problems with Harris' upper extremities.  (R. 609).  Regarding Harris' lower extremities, Dr. Jennings found that Harris' gait, including heel-toe gait, was normal.  *Id.*  He said that Harris could squat and that his reflexes were good.  *Id.*  Straight leg raising was negative, and there was no loss of range of motion.  *Id.*  His assessments were chronic lumbar pain and obesity.  *Id.*

Dr. Jennings completed a Medical Source Statement, and he found that Harris could continuously lift up to 80 pounds, and he could frequently lift and carry up to 100 pounds.  (R. 617).  Dr. Jennings indicated that Harris could sit, stand, and walk, for eight hours in an eight-hour work day.  (R. 618).  He found that Harris could continuously use his hands for all functions, and he could continuously use his feet for pedal controls.  (R. 619).  He indicated that Harris could frequently climb, and could continuously balance, stoop, kneel, crouch, and crawl.

---

[3] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM-IV 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*.  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

*Id.*  He found no other areas of limitation.  (R. 620-23).  On a range of joint motion evaluation chart, he found that Harris had some limitation in back extension and flexion and in lateral flexion to the left and right.  (R. 624).  He found that all other testing was within normal limits. (R. 624-27).

Paul K. Shields, Ed.D. completed a Mental Status Form and a Mental Residual Functional Capacity Assessment dated June 2009.  (R. 593-98).  Dr. Shields said that Harris' immediate and short term memory were intact.  (R. 593).  He said that Harris' affective processes shifted between anxiety and depression.  *Id.*  He said social adaptive behavior was significantly impaired.  *Id.*  He said that Harris' ability to perform work-related responsibilities had deteriorated.  *Id.*  Dr. Shields said that Harris' physical limitations, such as limited time that he could stand or sit, accelerated his depression and anxiety.  (R. 594).  He said that Harris could carry out simple, but not complex, instructions.  *Id.*  He said that Harris could not adequately respond to workplace pressure and could not cooperate with supervisors or peers in a satisfactory manner.  *Id.*  Dr. Shields' Axis I diagnosis was post-traumatic stress disorder (DSM IV code 309.81), and he assessed Harris with a GAF of 45-50.  *Id.*  Of twenty functional categories on the Mental Residual Functional Capacity Assessment, Dr. Shields found that Harris had severe limitations in four, marked limitations in eight, moderate limitations in two, and no significant limitation in six.   (R. 595-96).

Dr. Stewart, Harris' treating psychiatrist, completed a Mental Status Form on February 14, 2008.  (R. 360).  His diagnoses were dysthymic disorder, generalized anxiety disorder, and panic disorder.  *Id.*  Dr. Stewart said that Harris was normally a healthy and stable individual, but work stress at times would trigger panic or depression.  *Id.*  He said that Harris left his house for activities less frequently than he had previously.  *Id.*  Dr. Stewart considered Harris' prognosis to

be guarded because his symptoms were still present since his first visit in June 2006. *Id.* He answered yes to a question regarding whether Harris could remember, comprehend and carry out instructions, but no to a question regarding whether he could respond to work pressure, supervision, and coworkers. *Id.*

Dr. Stewart apparently completed a second Mental Status Form on May 29, 2008. (R. 403). On this second form, Dr. Stewart gave diagnoses of major depression, recurrent, severe, with suicidal thinking, and generalized anxiety disorder. *Id.* He said that Harris had great difficulty with work stress, and he said that Harris' activities of daily living were very limited and he stayed home most of the time. *Id.* He said that Harris' prognosis was guarded. *Id.* He again stated that Harris could carry out instructions, but that he could not respond to work pressure, supervision, and coworkers "due to current levels of depression and anxiety." *Id.*

Dr. Stewart wrote a "To Whom It May Concern" letter dated June 4, 2008, and he said that Harris had symptoms of major depression with anger. (R. 634). He said that Harris continued to have generalized anxiety "to the level of panic disorder at times." *Id.* He then said that Harris' back pain remained severe requiring pain medication, and that Harris' back had recently "locked up" and he required assistance to get out of the bathtub. *Id.* He said that Harris remained "totally disabled from any form of employment due to the combination of depression, panic and chronic pain." *Id.*

## Procedural History

Harris filed an application dated May 1, 2008, for Title II disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (R. 205-08). Harris alleged onset of disability as of February 1, 2008. (R. 205). The application was denied initially and on reconsideration. (R. 103-07, 109-11). Hearings before ALJ Gene M. Kelly were held on June

14

25, 2009, and May 20, 2010 in Tulsa, Oklahoma.  (R. 31-100).  By decision dated July 16, 2010,

the ALJ found that Harris was not  disabled.  (R. 12-25).  On July 21, 2011, the Appeals Council

denied review of the ALJ's findings.  (R. 1-3).  Thus, the decision of the ALJ represents a final

decision for purposes of this appeal.  20 C.F.R. § 404.981.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[4]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Harris met insured status requirements through December 31, 2013. (R. 14).  At Step One, the ALJ found that Harris had not engaged in substantial gainful activity since his alleged onset date of February 1, 2008.  *Id.*  At Step Two, the ALJ found that Harris had severe impairments of problems with his back, stomach, legs, feet, and left wrist; depression; anxiety; learning disorder; and hypertension.  *Id.*  At Step Three, the ALJ found that Harris' impairments did not meet any Listing.  (R. 18).

The ALJ determined that Harris had the RFC to perform a limited range of light work:

> except stand/walk for three hours out of an eight hour day, 30 minutes at one time; sit for six hours out of an eight hour day, one hour at a time; occasionally climb, bend, stoop, squat, kneel, crouch, crawl, and reach overhead and behind.  In addition, he would have slight limitation in fingering, feeling and gripping with left upper extremity.  The claimant should avoid rough and uneven surfaces, unprotected heights, fast and dangerous machinery, and cold.  In regards to mental limitations, the work would need to be simple, repetitive, and routine, limited content and stress, and limited contact with the public.

(R. 19-20).  At Step Four, the ALJ found that Harris could not perform any past relevant work.

(R. 23).  At Step Five, the ALJ found that there were jobs in significant numbers in the national

economy that Harris could perform, considering his age, education, work experience, and RFC.

*Id.*  Thus, the ALJ found that Harris was not disabled from February 1, 2008 through the date of

the decision.  (R. 24).

## Review

Harris asserts three arguments.  First, he argues that the ALJ's decision is erroneous in its

consideration of the opinion evidence.  Second, he argues for reversal because the ALJ failed at

Step Five to include all of Harris' impairments in the RFC and in the hypothetical questions to

the vocational expert.  Third, Harris argues that the ALJ's credibility assessment was flawed.

Because the undersigned finds that the ALJ's decision is supported by substantial evidence and

complies with legal requirements, the ALJ's decision is affirmed.

**Issues Relating to Opinion Evidence**

Regarding opinion evidence, generally the opinion of a treating physician is given more

weight than that of an examining consultant, and the opinion of a nonexamining consultant is

given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  A treating

physician's opinion must be given controlling weight if it is supported by "medically acceptable

clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215; *see also* 20 C.F.R. § 404.1527(d)(2). However, even if the ALJ determines that the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and must be weighed according to the factors set out in Section 404.1527(d). Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Goatcher v. U.S. Dept. Of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995). An ALJ may reject a brief, conclusory statement by a treating physician if it is not supported by the medical evidence. *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987); *see also Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994). However, if the ALJ decides to reject the opinion outright, he must provide "specific, legitimate reasons" for doing so. *Frey*, 816 F.2d at 513.

Harris makes several arguments relating to the medical evidence and especially the opinion evidence. He first asserts that the ALJ did not sufficiently take into account the opinion evidence of Dr. Stewart. The Court, however, finds that the ALJ's discussion of the opinion evidence of Dr. Stewart was adequate. When evidence does not conflict with the ALJ's RFC determination, the ALJ has a reduced burden to expressly discuss the evidence. *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004).

In *Howard*, the Tenth Circuit rejected the claimant's argument that the ALJ had not complied with his obligation to discuss the evidence, citing to *Clifton v. Chater*, 79 F.3d 1007,

1009-10 (10th Cir. 1996).  The *Howard* court first found that the ALJ's discussion was adequate, but then, as a second point, found that "perhaps more importantly, in this case none of the record medical evidence conflicts with the ALJ's conclusion that claimant can perform light work. When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened."  *Howard*, 379 F.3d at 947.  *Howard* is directly applicable to the present case, because a common sense reading of the ALJ's decision leads to the conclusion that the ALJ's RFC was basically consistent with the opinion evidence offered by Dr. Stewart.

On the first form completed by Dr. Stewart, the only opinion he offered regarding functional limitations that tended to support Harris' claim of disability was in answering no to whether Harris could respond to work pressure, supervision, and coworkers.  (R. 360).  While Dr. Stewart's opinions on the second form, completed just a few months later, were stated somewhat more emphatically, they were essentially the same regarding Harris' functional limitations.  (R. 403).  A common sense reading of the ALJ's decision leads to the conclusion that the ALJ developed an RFC to address the concerns of Dr. Stewart by including this language:  "In regards to mental limitations, the work would need to be simple, repetitive, and routine, limited content and stress, and limited contact with the public."  (R. 20).  While the ALJ's language did not specifically address supervisors and coworkers, it did address the general issue of work stress which was the main issue identified by Dr. Stewart on the two forms.

Thus, this explains why the ALJ said in his decision that the records of Dr. Stewart were given "substantial weight" and that his RFC determination was supported by the records of Dr. Stewart.  (R. 22-23).  The ALJ was sincere in these statements because he had attempted in his RFC formulation to address the concerns of Dr. Stewart.  In a similar case, the Tenth Circuit

recently rejected an argument that the ALJ had not sufficiently discussed the opinion evidence:

> In sum, we reject [claimant's] contention that the ALJ's opinion does not
> adequately evaluate and discuss the medical-source evidence.  Where, as here, we
> can follow the adjudicator's reasoning in conducting our review, and can
> determine that correct legal standards have been applied, merely technical
> omissions in the ALJ's reasoning do not dictate reversal.

*Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012).

Harris argues that there is an inconsistency in the ALJ's decision because he treated the

"To Whom It May Concern" letter of June 2008 in a different manner from the two forms

completed by Dr. Stewart in February and May 2008.  Harris' argument ignores the ALJ's

reasoning, however, because the ALJ said that Dr. Stewart's specific statement that Harris "was

disabled due to depression, panic, and chronic pain" was "not given much weight."  (R. 23).  The

ALJ explained his reasoning by saying that this statement was not consistent with Dr. Stewart's

treatment records or by the records concerning Harris' physical medical treatment.  *Id.*  He also

said that Dr. Stewart was not trained in the area of back impairments.  *Id.*  It is clear that the ALJ

found it significant that Dr. Stewart, a psychiatrist, was essentially giving an opinion regarding

the extent of Harris' pain and disabling symptoms from his back issues, and a review of Dr.

Stewart's letter confirms that he discussed Harris' back problems in some detail.  (R. 23, 634).

Seen in this light, it is not inconsistent for the ALJ to give substantial weight to the concerns of

Dr. Stewart regarding Harris' inability to deal with workplace stress, and to address those

concerns in his RFC determination, but to discount an opinion of Dr. Stewart that addressed

Harris' back pain.

Harris' brief includes some discussion of the opinions of Dr. Hickman and Dr. Shields,

including their GAF scores.  Dr. Hickman scored Harris' GAF as 55, and Dr. Shields scored it as

45-50.  (R. 594, 602).  Harris faults the ALJ for mentioning Dr. Hickman's score and not that of

Dr. Shields, but the ALJ rejected the opinions of both Dr. Hickman and Dr. Shields.  (R. 23).

This is therefore not a case where the ALJ recited only the evidence that tended to support a

finding of nondisability while ignoring the evidence that supported the claimant's claims.  *See*

*Robinson*, 366 F.3d at 1083 (An ALJ is "not entitled to pick and choose from a medical opinion,

using only those parts that are favorable to a finding of nondisability"); *Clifton*, 79 F.3d at 1009

("in addition to discussing the evidence supporting his decision, the ALJ also must discuss the

uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence

he rejects").

Harris then described in detail the findings of Dr. Shields as reflected in the two forms

that he completed.  His point in this exposition is not clear, but he appears to argue that the ALJ

should not have rejected these findings.  The ALJ described the forms completed by Dr. Shields

(R. 16), and then said that he gave those opinions "little weight."  (R. 23).  He explained that Dr.

Shields' opinions were not consistent with the records from Dr. Stewart and there were no

treatment records from Dr. Shields.  These are legitimate and supported reasons for discounting

the opinions of Dr. Shields.  *See Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007)

(medical evidence may be discounted if it is internally inconsistent or inconsistent with other

evidence) (further quotations omitted); *Castellano*, 26 F.3d at 1029 ("[a] treating physician's

opinion may be rejected if his conclusions are not supported by specific findings").

Harris also mentions in passing the finding by Dr. Hickman that Harris had a moderate

limitation of his ability to complete a normal workday and work week without interruptions from

psychologically based symptoms and to perform at a consistent pace without an unreasonable

number and length of rest periods.  Harris complains that the ALJ noted one moderate limitation

finding by Dr. Hickman, but did not go into detail regarding it.  (R. 17).  Harris does not explain,

however, how the ALJ's RFC is inconsistent with this moderate finding.  The Court finds that

the ALJ's RFC, limiting Harris to simple, repetitive, and routine work, with limited stress and

limited contact with the public, is consistent with the moderate finding of Dr. Hickman.

Additionally, the ALJ explained his reasons for giving Dr. Hickman's report little weight.  (R.

23).  Given that the ALJ's RFC was not inconsistent with this point of Dr. Hickman's report, and

the ALJ gave Dr. Hickman's report little weight overall, Harris' point is difficult to discern.

There was certainly no reversible error by the ALJ regarding Dr. Hickman's finding.

     Harris also complains that the ALJ did not discuss the reports of Dr. Massad and Dr.

Wainner, but Harris gives only one example of a specific finding in those reports that should

have been considered by the ALJ.  Harris asserts that the ALJ erred by failing to mention that Dr.

Massad found that Harris was capable of adapting to changes in a "familiar" environment.  (R.

393).  It would have been better practice for the ALJ to specifically discuss the reports of Dr.

Massad and Dr. Wainner, but there is nothing in them, including the word "familiar" as stressed

by Harris, that is significantly inconsistent with the ALJ's RFC determination.  As such, the

failure of the ALJ to discuss these reports was not reversible error.  *Howard*, 379 F.3d at 947

("When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a

claimant's RFC, the need for express analysis is weakened.").

     Harris makes two arguments in this section of his brief that the Court rejects as sophistry.

First, Harris complains that the ALJ stated that the opinions of Harris' doctors, including Dr.

Stewart, were that Harris' impairments were "mild for the most part," after having found that

Harris had "severe" impairments of depression, anxiety, and learning disabilities at Step Two.

Plaintiff's Opening Brief, Dkt. #15, p. 3.  Second, Harris complains that the ALJ found that he

had a "severe" problem with his left wrist at Step Two, but then included only a "slight"

limitation in his RFC determination.  *Id.* at 6.  These two arguments ignore the meaning of

"severe" at Step Two and "mild" or "slight" for purposes of an RFC determination.  Counsel for

Harris would like to create some one-for-one correlation that requires ALJs to find that all

impairments that are "severe" at Step Two then require "severe" functional limitations to be

included in an RFC, but there is no such requirement and to include such a correlation in the

Social Security disability framework would be nonsensical and would abolish the need for the

five-step sequential process.

> a finding of severe impairments (which is made at step two) does not require the
> ALJ to find at step five that the claimant did not have the [RFC] to do any work.
> After finding severe impairments, the ALJ still had the task of determining the
> extent to which those impairments . . . restricted [the claimant's] ability to work.

*Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007)

Harris argues that the ALJ erred by saying that Dr. Little, Dr. Tomecek, Dr. White, and

Dr. Stewart concurred that Harris' "impairments were mild for the most part."  (R. 22).  Harris

picks through the records for examples from these physicians that arguably illustrate impairments

that were more severe.  Plaintiff's Opening Brief, Dkt. #15, pp. 6-7.  The problem with this

argument is that there is substantial evidence that supports the ALJ's characterization.  For

example, Harris saw Dr. Tomecek in January 2007 after experiencing the sudden back pain at

work in December 2006.  (R. 320, 322-26).  A myelogram then showed no problems with the

previous fusion, and mild degenerative disk disease at the L2/L3 level.  (R. 325-26).  In February

2007, Harris had improved and was lifting 80-pound bags of feed.  (R. 319).  Dr. Tomecek gave

Harris a 25-pound lifting restriction and said he could return to work.  *Id.*  In May 2007, Harris

had returned to all of his previous activities, and in October 2007, Dr. Tomecek thought that

Harris was doing "far too well" to justify surgical intervention.  (R. 313, 317).  In February 2008,

Dr. Tomecek found that Harris functioned well with two or more Lortab a day.  (R. 368).  He

believed that Harris could work full time with a 25-pound lifting restriction.  (R. 369).  In April,

Dr. White, the pain specialist, said that Harris was doing "quite well."  (R. 375).  After imaging

studies in June 2010, Dr. Tomecek said that he did not see any "severe pathology" at the L2/L3

level, and he did not recommend surgery at that level, but he did recommend hardware removal.

(R. 749-50).  After the hardware removal, Dr. Tomecek said in September 2010 that he thought it

was a realistic goal for Harris to return to work, and he increased Harris' lifting limitation to 20

pounds.  (R. 758).

All of this is evidence that supports the ALJ's characterization of the doctors' records as

reflecting only mild impairments for the most part.  Harris' argument is that he would like for

this Court to give more weight to the evidence that is in his favor and less weight to the evidence

that disfavors his claim of disability.

> The possibility of drawing two inconsistent conclusions from the evidence does
> not prevent an administrative agency's findings from being supported by
> substantial evidence.  We may not displace the agency's choice between two fairly
> conflicting views, even though the court would justifiably have made a different
> choice had the matter been before it *de novo*.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations, quotations, and brackets omitted).

Harris next takes issue with the statement in the ALJ's decision that Dr. Tomecek made it

clear that Harris was able to work full time with a 25-pound lifting limit.  (R. 22).  He asserts that

the ALJ did not discuss his testimony that Dr. Tomecek originally limited him to 10 pounds, and

he asked that it be increased to 25 pounds so that he could remain at work.  Plaintiff's Opening

Brief, Dkt. #15, p. 7.  The ALJ did, in fact, note this testimony on Harris' part when he was

summarizing all of his testimony.  (R. 20-21).  He did not have to repeat this testimony when he

made this finding regarding Dr. Tomecek's evidence, and there is substantial evidence to support

his finding.  (R. 318-19, 369, 758).

The ALJ's evaluation of the opinion evidence complied with legal requirements and was supported by substantial evidence.

**Issues Relating to Step Five**

At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account her age, education, work experience and RFC. *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999).  The ALJ is allowed to do this through the testimony of a vocational expert (the "VE"). *Id.* at 1089.  Harris makes several arguments that the ALJ's RFC determination and his hypothetical did not relate with precision all of Harris' impairments, and therefore the testimony of the VE did not constitute substantial evidence. *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991).

Harris' arguments are not persuasive.  He asserts that the ALJ erred by failing to include nonsevere impairments of shortness of breath, anemia, and colon problems in his RFC determination and in his hypothetical questions to the VE.  Plaintiff's Opening Brief, Dkt. #15, pp. 7-8.  There is no indication that the ALJ failed to include these nonsevere impairments in formulating his RFC determination.  The Tenth Circuit has often stated that the court takes the ALJ at his word when he states that he has considered all of the evidence. *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009).  Here, the ALJ specifically stated that in determining Harris' RFC, he considered all symptoms and all of the opinion evidence.  (R. 20).  He recited Harris' testimony regarding these nonsevere impairments.  (R. 20-21).  He was not required, on the evidence before him, to include any more specific limitations in his RFC determination.

Harris also states that the ALJ should have considered his obesity, especially because Dr. Jennings included obesity as a diagnosis in his report as an examining consultant.  (R. 609).

While the ALJ did not include obesity as a separate impairment at Step Two, there is no indication that he failed to consider Harris' symptoms that might have been worsened by his weight.  Moreover, Dr. Jennings, the physician who diagnosed obesity, went on to find that Harris was capable of performing work that required frequent lifting up to 100 pounds, so he obviously did not find Harris' obesity to be disabling.  (R. 617-23).  The ALJ rejected Dr. Jennings' report and described a 100-pound weight limit as "not feasible."  (R. 23).  The ALJ's failure to include obesity as a separate impairment under these circumstances was not erroneous.

The ALJ's findings at Step Five were supported by substantial evidence and complied with legal requirements.

**Credibility**

Credibility determinations by the trier of fact are given great deference.  *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2001).  In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence.  *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

The ALJ gave an introductory sentence[5] to his credibility assessment, and he then summarized some of the medical evidence.  (R. 21-22).  He then provided four separate paragraphs giving reasons why he found Harris to be less than fully credible.  (R. 22).

While the ALJ's credibility assessment could and should have been more detailed and fact-specific, the Court finds it adequate.  *Cobb v. Astrue*, 364 Fed. Appx. 445, 450 (10th Cir. 2010) (unpublished) (while ALJ's credibility assessment was summary, taking the decision as a whole the ALJ's findings regarding the claimant's testimony were "clear enough" without violating rule against *post hoc* justification).  The Court has some concern that portions of the ALJ's credibility discussion are impermissible boilerplate, but "despite the use of disfavored language, [the Court is] persuaded that the ALJ's credibility determination is closely and affirmatively linked to substantial evidence."  *Miller v. Astrue*, 2012 WL 4076128 *4 (10th Cir.) (unpublished).  For example, the ALJ discussed Harris' activities, such as those he reported to Dr. Tomecek in February 2008 of cutting firewood, mowing his yard, hauling hay, and riding horses.  (R. 21-22).  The ALJ also discussed some portions of the objective medical evidence that undermined Harris' claim of total disability, such as the evidence that Dr. Tomecek had "no problems with [Harris] working full time with a 25 pound lifting restriction."  (R. 22).  Contrast between the claims of the claimant and the medical evidence of record is a legitimate reason

---

[5] Harris faults the introductory language used by the ALJ: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (R. 21). While this language might have been "meaningless boilerplate," it was merely an introduction to the ALJ's analysis and was not harmful.  *See Keyes-Zachary*, 695 F.3d at 1170 (use of boilerplate language in a credibility assessment is problematic only "in the absence of a more thorough analysis") (further quotations omitted).

supporting an adverse credibility assessment. *Keyes-Zachary*, 695 F.3d at 1169-71 (affirming credibility assessment in part because the ALJ detailed "medical observations reflecting only limited impairment"); 20 C.F.R. § 404.1529(c)(4) ("we will evaluate your statements in relation to the objective medical evidence").

Thus, the ALJ gave legitimate reasons for his credibility assessment, and those reasons were closely linked to substantial evidence. *Kepler*, 68 F.3d at 391; *Keyes-Zachary*, 695 F.3d at 1167 ("common sense, not technical perfection, is our guide").

Harris asserts that the ALJ's credibility assessment was not adequate, and several of his arguments relate to activities of daily living. Plaintiff's Opening Brief, Dkt. #15, pp. 9-10. For example, Harris states that he "consistently reported very limited activities of daily living," but almost all of his citations to support this statement were to his own subjective testimony. In contrast, as the ALJ noted, Harris often reported activities to his physicians that could hardly be described as "very limited." Examples would be lifting 80-pound bags of feed (R. 319), doing "heavy labor" (R. 317), and walking between three and six miles a day (R. 752, 758). Harris' arguments related to his activities are not persuasive.

Harris argues that the ALJ "minimized the importance" of the pain relief medications and psychotropic medications that he was prescribed. The Court disagrees with this characterization and finds that the ALJ's summary of Harris' prescription medications was accurate. For example, he noted that Dr. Little, Harris' primary care physician, had supervised his use of Lortab in 2007, had diagnosed him with narcotic dependence and depression, and had referred him for pain management in January 2008. (R. 15).

Harris also argues that the ALJ should have given him credit for several items, including the fact that he stood up during the hearing due to discomfort sitting, the fact that Dr. Massad

said that there was nothing that indicated that Harris' reports were not credible, and Harris' strong work history.  Plaintiff's Opening Brief, Dkt. #15, p. 10.  These arguments constitute "an invitation to this court to engage in an impermissible reweighing of the evidence and to substitute our judgment for that of the Commissioner," and the undersigned declines that invitation.

*Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *Miller ex rel. Thompson v. Barnhart*, 205 Fed. Appx. 677, 681 (10th Cir. 2006) (unpublished) (claimant disputed ALJ's view of evidence and relied on other evidence, but court declined to reweigh evidence).

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 14th day of December 2012.

Paul J. Cleary
United States Magistrate Judge